

## NUMBER 13-07-047-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

RODNEY CLINE,                                                    Appellant,

v.

THE STATE OF TEXAS,                                             Appellee.

### On appeal from the 411th District Court
### of San Jacinto County, Texas

## MEMORANDUM OPINION

### Before Justices Yañez, Benavides, and Vela
### Memorandum Opinion by Justice Vela

Appellant, Rodney Cline, appeals his conviction for the manufacture of more than

400 grams of a controlled substance, methamphetamine.[1] By two issues, Cline argues the

evidence was legally and factually insufficient to support the conviction. We affirm.

---

[1]*See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(6), 481.112(f) (Vernon 2003 & Supp. 2007).

I. Background

When Constable Charles Clack tried to serve a felony probation warrant on Catherine Starling at a home near Coldspring, Texas on April 6, 2005, he and fellow officers discovered two methamphetamine labs.[2] Starling told officers she operated the labs along with her boyfriend, John Cline, who was present, and his brother, Rodney Cline, who was not present. Chris Martin, Starling's sixteen-year-old son, told officers he lived there and that the bedroom where one of the labs was located was where Rodney Cline slept. John Cline, who was high on methamphetamine, claimed both labs belonged to Rodney Cline. James Cline, John and Rodney's father, and former owner of the house,[3] said he knew nothing of the meth labs.

The raid resulted in at least five indictments for manufacturing a controlled substance. John Cline and Catherine Starling pleaded guilty to manufacturing a controlled substance. John received a five-year prison sentence; Starling received five years' community supervision in return for testifying against Rodney Cline. Rodney pleaded not guilty. James Cline and his wife Lydia were also indicted.[4]

At Rodney Cline's trial, the only eye-witness connecting Rodney with manufacturing meth was Catherine Starling. She testified Rodney stayed in the bedroom that contained a meth lab and that she had seen him drying chemicals and cutting matches, but had not personally watched him mix all of the chemicals into a final product. She explained that,

---

[2]One was in a room inside the house; the second was in a shed in the back yard.

[3]The house seems to have been owned by James Cline, Jr., who is otherwise uninvolved with this case. At trial, James Cline, Sr. testified that he and his wife were living in Humble at the time. Starling testified that they were living in the Coldspring house. Various witnesses disagreed on how many people lived at the Coldspring house. Starling said that there were seven, Martin said six, John and James Cline, Sr., and his wife, Lydia Cline, said four.

[4]As of Rodney's trial, they had yet to be tried.

while Rodney was not at the home on April 6, 2005 (the date of the raid), he had been there either one or two days earlier. She testified John and Rodney Cline aided each other in producing meth and jointly sold it from the home.

Starling's son, Chris Martin, testified he had seen Rodney using the microwave in a way that he associated with producing meth. He also said the bedroom where the meth lab was found was Rodney's.

The prosecution also presented testimony from Constable Clack, from another officer present during the April 6th raid, from a state meth task force officer, and from a crime-lab chemist, though they gave no evidence directly linking Rodney to the crime.

The defense presented testimony from four witnesses, testifying that Rodney Cline did not live at the Coldspring house in the weeks preceding the raid.[5] One of them, John, specifically said that Rodney was not involved in meth production at the Coldspring house.

The jury found Rodney guilty. At a sentencing hearing on November 30, 2006, the trial court sentenced him to fifteen years in prison, the minimum sentence available for the crime.[6] He now appeals to this Court.

## II. Accomplice-Witness Testimony

Rodney's two issues claim the evidence was legally and factually insufficient to support the jury's verdict. A fundamental element of both issues is that there was insufficient evidence to corroborate Catherine Starling's testimony, and thus we should exclude it from consideration under the accomplice-witness rule.

Neither a judge nor a jury can convict a defendant based on the testimony of an

---

[5]Defense witnesses did not agree on when, precisely, Rodney stopped living at the Coldspring house, though all agreed he did not live there after April 1.

[6]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (Vernon 2003).

3

accomplice unless there is independent evidence "tending to connect" the defendant with the crime. TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005); *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). To determine whether accomplice testimony is sufficiently corroborated under the accomplice-witness rule, we must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).

The non-accomplice evidence need not directly link the defendant to the crime, nor must it be sufficient to establish guilt beyond a reasonable doubt; rather, the standard is only that it have a tendency to connect the defendant to the crime. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). While the defendant's mere presence at the crime scene is not sufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Trevino v. State*, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999) (quoting *Dowthitt*, 931 S.W.2d at 249).

Here, the non-accomplice evidence comes from Starling's son, Chris Martin:[7]

Q: Okay. Are you familiar with how methamphetamine is manufactured?

A: Not the whole thing, but I know you have got to dry it out.

Q: Okay. And did you see Rodney Cline doing anything related to making methamphetamine?

A: I seen him go to the microwave and use it a lot.

Q: Okay. And do you see what he was taking to the microwave?

---

[7]Though Martin seems to have been present when methamphetamine was being produced at the Coldspring house, there are no allegations that he participated in the criminal enterprise.

4

A: It was a plate-looking thing. It's like what they made cornbread in, but it's glass.

Q: Okay. Was cornbread or some other food in that?

A: No, sir.

Q: Okay. What did it look like that was in there?

A: It looked like the bottom was real foggy.

Among the evidence found in the bedroom where Rodney slept was a round glass pie plate coated in a residue of liquid and powder. It tested positive for methamphetamine. Constable Clack testified meth producers often use microwaves to dry their product. Also shown to the jury was a photograph taken of a microwave found in the bedroom. The photograph showed a spoon and syringe inside the microwave, which Constable Clack told the jury were tools often used in producing meth. This evidence tends to connect Rodney to the manufacture of methamphetamine; thus Starling's testimony could be used to convict Rodney of the crime.

### III. Legal and Factual Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim.

App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When reviewing the factual sufficiency of the evidence, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We will set aside the verdict only if: (1) the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). We cannot conclude a conviction is "clearly wrong" or "manifestly unjust" simply because we would have voted to acquit. *Watson*, 204 S.W.3d at 417. In other words, we may not simply substitute our judgment for the fact-finder's judgment. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). To reverse for factual sufficiency, we must determine, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417. In examining a factual sufficiency challenge, we defer to the fact-finder's determination of the credibility of the evidence. *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003).

Elements of the Offense

The essential elements of the crime Rodney Cline was charged with are that he (1)

knowingly (2) manufactured (3) more than 400 grams (4) of a controlled substance listed in Penalty Group 1. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (f). Methamphetamine is a controlled substance listed in Penalty Group 1. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(6) (Vernon 2003).

Analysis

Catherine Starling testified Rodney made meth in the bedroom of the Coldspring house and that he traded ingredients with John, who made meth in the shed behind the house. Chris Martin testified he had seen Rodney using the microwave in a way that he associated with producing meth. He also said the bedroom where the meth lab was found was Rodney's. Though Chris was not completely familiar with how methamphetamine was manufactured, he knew that "you have got to dry it out." He saw Rodney using the microwave "a lot" and said that Rodney would take to the microwave a "plate-looking thing" "like what they made cornbread in, but it's glass." He testified there was no cornbread or other food in that glass container.

Among the evidence found in the bedroom where Rodney slept was a round glass pie plate coated in a residue of liquid and powder. It tested positive for methamphetamine. Constable Clack testified meth producers often use microwaves to dry their product. Also shown to the jury was a photograph taken of a microwave found in the bedroom. The photograph showed a spoon and syringe inside the microwave, which Constable Clack told the jury were tools often used in producing meth.

The crime lab determined that the amount of meth recovered from the joint operation was greater than 400 grams. Accordingly, the evidence is legally sufficient to support the verdict. We overrule Rodney's first issue.

7

In addition to the extensive evidence that meth labs existed at the Coldspring house, the evidence against Rodney consisted of one prosecution witness who said that Rodney lived at the Coldspring house around the time of the raid and made meth there, and one witness who said Rodney lived at the Coldspring house around the time of the raid and performed activities associated with making meth. The defense presented one witness who said Rodney did not make meth and did not live in the Coldspring house at the time, and three witnesses who said Rodney did not live at the Coldspring house at the time. From the evidence in the record, it is impossible to conclude that the verdict was manifestly unjust or that it was against the great weight and preponderance of the evidence. Thus, we defer to the fact-finder's decision. We overrule Rodney's second issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 29th day of July, 2008.